IN THE UNITED STATES DISTRICT COURT FOR

THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| ANDY JACK WILSON, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) No. CIV-14-779-W ) |
| CORRECTIONS CORPORATION OF AMERICA et al., | ) ) ) ) |
| Defendants. | ) |

## ORDER

On August 26, 2015, United States Magistrate Judge Gary M. Purcell issued a Second Supplemental Report and Recommendation in this matter and recommended that the Motion to Dismiss, which was filed by defendants Corrections Corporation of America, Inc. ("CCA"), Tim Wilkinson, William C. Rankins, David S. Worsham and William L. Barneck and which Magistrate Judge Purcell construed as a motion for summary judgment on the issue of exhaustion of administrative remedies, be denied and that the Cross-Motion for Partial Summary Judgment filed by plaintiff Andy Jack Wilson be granted as to that same issue. The parties were advised of their right to object, and the matter now comes before the Court on the defendants' Objection to Report and Recommendation, see Doc. 46, and Wilson's response thereto. See Doc. 47. Upon de novo review of the record,[1] the Court concurs with Magistrate Judge Purcell's suggested disposition of these motions.[2]

---

[1] Because the parties are familiar with the facts, the Court has not repeated the same in detail.

[2] Magistrate Judge Purcell focused on Wilson's attempts to exhaust his administrative remedies beginning in October 2013, and the defendants have not submitted any argument or authority that compels the Court to reject Magistrate Judge Purcell's findings and recommendations. Because the Court concurs with Magistrate Judge Purcell's analysis, the Court

At the time the incident giving rise to this lawsuit occurred, Wilson was incarcerated at Davis Correctional Facility ("DCF"), in Holdenville, Oklahoma. DCF is operated by CCA, a private entity that houses inmates pursuant to a contract with the Oklahoma Department of Corrections ("ODOC"); Wilkinson is DCF's Warden, and CCA employees Rankins, Worsham and Barneck, are, respectively, a Unit Manager, a Case Manager and a Senior Correctional Officer. Rankins is also Commander of DCF's Special Operations Response Team ("SORT"); Worsham and Barneck are SORT members.

On November 7, 2012, during a routine cell search, Wilson and his cellmate were "discovered unresponsive."[3] Doc. 36-11 at 2. A cell extraction was initiated, and at Rankins' direction, Worsham fired an ALS6227 OC Powder Blast Dispersion Projectile (37 mm)[4] into Wilson's cell through the food port. The projectile hit Wilson in the head. He was transported first to Holdenville General Hospital ("HGH"), see Doc. 36-5, for treatment and then to OU Medical Center "for further evaluation." Doc. 36-6 at 2.

The CT scan performed at HGH was deemed "insufficient," Doc. 40-3 at 3, and a repeat CT was ordered at OU Medical Center. That scan showed an "[a]cute, minimally

---

finds it unnecessary to repeat that analysis again in the instant Order. The Court has instead confined its review of the parties' submissions to that period of time immediately following the incident on November 7, 2012.

[3] A urine drug screen was "positive for amphetamines, methamphetamines, marijuana, tricyclic antidepressants and benzodiazepines[ ]." Doc. 36-6 at 2-3; e.g., Doc. 40-1 at 2.

[4] According to an incident report completed by Rankins, Worsham fired two (2) shells into Wilson's cell. See Doc. 36-11 at 2, ¶ 8.
A Preliminary Review Report prepared on November 8, 2012, by Wilkinson's designee, after that individual had watched a video of the incident, indicated "that SORT [members] did not utilize an ALS OC37 Muzzle Blast," Doc. 36-27 at 3, ¶ I.a, but had instead mistakenly "fired an ALS6227 OC Powder Blast Dispersion Projectile (37MM)." Id. "The ALS6227 shoots out several cardboard disks . . . [one or more of which] struck . . . Wilson in the head . . . causing [his] . . . laceration." Id.

2

depressed comminuted right frontal bone fracture with underlying acute subdural and intraparenchymal hemorrhage." Doc. 36-3 at 2; e.g., Doc. 36-5; Doc. 36-10 at 3; Doc. 40-3. The "fracture . . . [transversed] and involv[ed] the outer table of [the] frontal sinus[ ] [and the right] medial orbital wall." Doc. 36-3 at 2.

According to OU Medical Center records, Wilson did "not recall [the] events[,]" Doc. 36-6 at 3, resulting in his "head trauma[.]" Id. His status was described as "post fall[,]" id. at 4; e.g., Doc. 36-7 at 2 ("injury to head and . . . face . . . and decreased mental status [from] fall . . . while being intoxicated with 'drugs'"); id. ("patient sustained a laceration from a fall"); id. at 8 ("patient sustained a laceration from a blunt force and fall"),[5] and it was recommended that Wilson be admitted "for hourly neurologic checks for at least 24 hours . . . ." Doc. 36-6 at 3.

On November 8, 2012, Wilson was transferred to Lindsay Municipal Hospital ("LMH"); he was discharged four (4) days later on November 12, 2012. See Doc. 36-4. The Discharge Summary listed Wilson's condition as "[s]table," id. at 2, and described his injuries as a "right frontal skull fracture, right orbital fracture, and subdural and subarachnoid hemorrhage, and a right frontal laceration." Id. Kamil Nemri, M.D., who prepared the summary, remarked that Wilson had been admitted to LMH so "his neurological function," id., could be monitored. As to cause, Dr. Nemri repeated that Wilson had "reportedly [fallen] at . . . [DCF] and hit his head and lost consciousness[,]" id.,

---

[5]OU Medical Center Progress Notes indicated that Wilson had "suffered a fall," Doc. 36-10 at 2–information that was "obtained from [Wilson] and [a DCF] officer." Id. The "Spontaneous Incidents/Use of Force: Check List/Closure," Doc. 36-11 at 2, completed by Rankins on November 7, 2012, read: "[I]t was believed that . . . Wilson, startled by the sound of the OC Muzzle Blast, rolled quickly to his right and hit his head on the metal toilet seat in his cell." Id. ¶ 8.

and he stated that he had "discuss[ed] with . . . [Wilson] about his memory lapses and headache, and that [such was] . . . consistent with a traumatic brain injury that sometimes [could] . . . take several months to improve." Id.

LMH nursing notes dated November 10, 2012, indicated that Wilson did "know he [had been] . . . hit in the head." Doc. 36-8 at 10. Notes dated the next day, November 11, 2012, further reported that Wilson "wanted to only talk about how he was told he had fallen to receive his injury[,]" id. at 12, because he "fel[t] certain some [had] tried to stomp him in the head to 'kill' him." Id.[6]

On November 12, 2012, Wilson returned to DCF; he was housed in the facility's medical unit from that date to November 20, 2012. Progress Notes dated November 13, 2012, and November 14, 2012, respectively, advised that Wilson "ha[d] periods of confusion," Doc. 36-13 at 2, and that while he was "alert[ ] [and had] answer[ed] questions appropriately," Doc. 40-13 at 5, he did "not remember how he was injured." Id.

James Yates, DCF Assistant Warden for Security Operations, met with Wilson sometime after 3:00 p.m. on November 14, 2012, "for over an hour," Doc. 40 at 8, and during that meeting, Yates and Wilson "specifically discussed what had happened during the . . . use of force incident and how [Wilson] . . . had been injured." Affidavit of James Yates (June 23, 2015) at 5, ¶ 12.

---

[6]See Affidavit of Aaron Odum (August 7, 2015) at 3, ¶ 5 (SORT member who accompanied Wilson to HGH, in response to Wilson's statement that "he thought other inmates had jumped him," told Wilson "that no inmates had jumped him and that something had happened during the cell extraction;" Odum denied further knowledge of the incident). See also Affidavit of Darrin Brewer (August 10, 2015).

4

Wilson filed this action on July 23, 2014, seeking redress under title 42, section 1983 of the United States Code. He has alleged in those claims that remain for resolution[7] that the defendants used excessive and unnecessary force and were deliberately indifferent to his health and safety. See Doc. 1 (First and Fifth Claims for Relief); Doc. 37.

The Prison Litigation Reform Act ("PLRA") of 1996 provides in pertinent part that

> [n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any . . . correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). "[E]xhaustion is mandatory under the PLRA," Jones v. Bock, 549 U.S. 199, 211 (2007); "unexhausted claims cannot be brought in court." Id. (citation omitted).

To exhaust in Oklahoma, a state prisoner must "'us[e] all steps that [ODOC] . . . holds out, and [do] so properly (so that . . . [ODOC can] address[ ] the issues on the merits).'" Woodford v. Ngo, 548 U.S. 8, 90 (2006)(quotation omitted)(emphasis deleted). "Proper exhaustion demands compliance with [ODOC's] . . . deadlines and other critical procedural rules[.]" Id.

On November 7, 2012, ODOC's Offender Grievance Process, as outlined in OP-090124, see Doc. 14-2,[8] required four (4) steps. See Thomas v. Parker, 609 F.3d 1114, 1117 (10th Cir. 2010)(ODOC grievance process requires informal consultation with staff,

---

[7]See Doc. 37.

[8]The copy of the ODOC Offender Grievance Process submitted by the defendants was effective January 29, 2013. See Doc. 14-2. In the absence of any evidence to the contrary, the Court has assumed that the applicable provisions of that document read the same as the version in effect in November 2012.

then three written steps).⁹ An inmate must first attempt to resolve any grievable issue informally "by talking with the affected staff, supervising employee or other appropriate staff within three days of the incident." Doc. 14-2 at 7, Section IV.B. If the matter is not resolved, the inmate must then proceed with step two, which is considered part of "[t]he informal resolution process . . . ." Id. at 6, Section IV. That step requires the submission of "a 'Request to Staff'¹⁰ . . . [that] detail[s] the issue/incident completely but briefly." Id. at 7, Section IV.C. "The 'Request to Staff' must be submitted within seven calendar days of the incident[.]" Id. Section IV.C.3.

These two steps are mandatory, and neither the initial three (3)-day informal resolution deadline nor the subsequent seven (7)-day Request to Staff ("RTS") deadline may be extended. Wilson took neither step.¹¹ Accordingly, for purposes of the instant Order,¹² all actions taken either by Wilson or the defendants after November 14, 2012, are arguably irrelevant, and unless circumstances exist that excuse exhaustion, Wilson is foreclosed from pursuing his claims. E.g., Woodford, 548 U.S. at 88 (to properly exhaust administrative remedies prisoners must complete administrative review process in accordance with applicable procedural rules, including deadlines).

---

⁹Steps one and two are outlined in that section of ODOC's Offender Grievance Process entitled "Informal Resolution." See Doc. 14-2 at 6-8, Section IV. Steps three and four involve the submission, review and appeal of formal grievances. See id. at 8-15.

¹⁰The term "Request to Staff" is defined as "[a] system of two-way communication between staff and offenders to resolve complaints/issues informally[.]" Doc. 14-2 at 3, Section I.B.

¹¹See Doc. 14 at 29 (Wilson's first filing to Wilkinson was RTS dated October 15, 2013, some eleven (11) months after complained-of incident); id. (October 2013 RTS "is clearly an untimely filing").

¹²See n.2 supra.

Exhaustion is an affirmative defense, e.g., Jones, 549 U.S. at 212; accordingly, "the burden of proof . . . lies with the defendant[s]." Roberts v. Barreras, 484 F.3d 1236, 1241 (10th Cir. 2007). To prevail, they must first demonstrate the absence of a disputed material fact regarding that defense. If they do so, Wilson "must then demonstrate with specificity the existence of a disputed material fact. If . . . [he] fails to make such a showing, the affirmative defense [of exhaustion] bars his claim[s], and the defendant[s] . . . [are] entitled to summary judgment as a matter of law." Hutchinson v. Pfeil, 105 F.3d 562, 564 (10th Cir. 1997)(citation omitted).[13]

It is undisputed that Wilson did not attempt to informally resolve any issues arising from the incident on November 7, 2012, either "by talking with the affected staff," Doc. 14-2 at 7, Section IV.B, or by submitting a timely RTS. Wilson's failure to do so however is not fatal if the defendants "'prevent[ed], thwart[ed], or hinder[ed,]'" Tuckel v. Grover, 660 F.3d 1249, 1252 (10th Cir. 2011)(quotation omitted), his efforts or if exhaustion would have been futile. The latter exception is applied only "when administrative relief is 'effectively

---

[13]Summary judgment is appropriate if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), F.R.Civ.P. The Court does not evaluate the credibility of the witnesses, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986), or "weigh the evidence and determine the truth of the matter . . . ." Id. at 249. Rather, the Court must decide "whether there is a genuine [disputed] issue [of fact] . . . [and] there is no [triable] issue . . . unless there is sufficient evidence favoring the nonmoving party for a [factfinder] . . . to [find] . . . for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50 (citations omitted). The Court's inquiry must be whether the evidence, when viewed "through the prism of the substantive evidentiary burden," id. at 254, "presents a sufficient disagreement to [preclude summary judgment] . . . or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52.
"Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another." Buell Cabinet Co. v. Sudduth, 608 F.2d 431, 433 (10th Cir. 1979) (citations omitted). When reviewing a cross-motion, the Court must "'construe all inferences in favor of the party against whom the motion under consideration is made[.]'" Pirkheim v. First Unum Life Insurance, 229 F.3d 1008, 1010 (10th Cir. 2000)(quoting Andersen v. Chrysler Corp., 99 F.3d 846, 856 (7th Cir. 1996)).

foreclosed.'" Reyna v. Ledezma, 415 Fed. Appx. 926, 927 (10th Cir. 2011)(quoting Goodwin v. Oklahoma, 923 F.2d 156, 158 (10th Cir. 1991))(cited pursuant to Tenth Cir. R. 32.1). In applying these narrow exceptions, the Court finds under the limited circumstances of this case that exhaustion is excused.[14]

Wilson's injuries and immediate hospitalization rendered impossible any informal attempts to resolve the matter within three (3) days. His ability to meet the seven (7)-day deadline was hindered, if not thwarted, by his continued hospitalization. The situation was exacerbated by Wilson's ignorance of, and confusion about, the actual cause of his injuries–ignorance and confusion that resulted from the injuries themselves, see Doc. 36-4 at 2; Doc.36-8 at 10, 12; Doc. 40-13 at 5, as well as from the defendants' misstatements. See, e.g., Doc. 36-6 at 2 ("patient . . . fell and hit his head"); Doc. 36-10 at 2; Doc. 11 at 2 (Wilson, startled by sound of OC Muzzle Blast, rolled right and hit head on metal toilet).[15]

Based on the foregoing, the Court

(1) FINDS that exhaustion of administrative remedies has been excused in connection with Wilson's First and Fifth Claims for Relief for the reasons stated herein as well as for the reasons stated by Magistrate Judge Purcell;

---

[14]E.g., Tuckel, 660 F.3d at 1252 (to be "available," remedy must be "capable of use for the accomplishment of a purpose")(quoting Booth v. Churner, 532 U.S. 731, 737 (2001)(citation omitted))).

[15]The defendants have not explained why Wilson was not provided immediate assistance after he was injured and rendered impaired as required by ODOC's Offender Grievance Process, why Wilson was not entitled to such assistance during the relevant three (3)-day and seven (7)-day periods or why applicable RTS forms were not made available to Wilson while he was housed in DCF's medical unit. See Doc. 41-7 at 4, ¶ 7. Section III.B clearly states that "[a]ppropriate assistance for those impaired or disabled will . . . be provided." See Doc. 14-2 at 5, Section III.B.

(2) ADOPTS the Second Supplemental Report and Recommendation [Doc. 45] issued on August 26, 2015, in its entirety and in particular as to Magistrate Judge Purcell's ultimate finding that the defendants obstructed and/or hindered Wilson's efforts to exhaust his administrative remedies and his suggestion that Wilson was entitled to summary judgment on the issue of exhaustion;

(3) DENIES the defendants' Motion to Dismiss [Doc. 14] filed on October 17, 2014, and construed as a motion seeking relief under Rule 56, F.R.Civ.P.;

(4) GRANTS Wilson's Cross-Motion for Partial Summary Judgment [Doc. 35] filed on July 9, 2015; and

(5) RE-REFERS this matter to Magistrate Judge Purcell for further proceedings.

ENTERED this 4th day of December, 2015.

LEE R. WEST
UNITED STATES DISTRICT JUDGE